No. 47,405

Kansas Commission on Civil Rights, *Appellee,* v. Sears, Roebuck and Company, *Appellant.*

(532 P. 2d 1263)

Opinion filed March 1, 1975.

*Mark L. Bennett,* of Topeka, argued the cause, and *Clayton M. Davis* and *Mark L. Bennett, Jr.,* also of Topeka, were with him on the brief for the appellant.

*Charles S. Scott,* of Topeka, argued the cause, and *Curt T. Schneider,* attorney general, and *Roger W. Lovett,* were with him on the brief for the appellee.

The opinion of the court was delivered by

FONTRON, J.: On February 16, 1973, William V. Minner filed a complaint with the Kansas Commission on Civil Rights, herein called the commission, complaining of a discriminatory practice by Sears, Roebuck and Company, hereafter referred to as Sears or defendant, in refusing him credit because he was black, in violation of K. S. A. 44-1009 (c) (1) (Weeks, 1973). Thereafter, and on November 28, 1973, the commission issued a subpoena *duces tecum* to Mr. Loyd Reynolds, the credit manager of the Sears store in Topeka, directing him to produce the following:

"1. List of persons who applied and received credit thirty (30) days prior to January 6, 1973, and thirty (30) days after, also any rating your company may have received from any credit bureau on these persons.

"2. List of persons who applied and were denied credit thirty (30) days prior to January 6, 1973, and thirty (30) days after, also any rating your company may have received from credit bureau on these persons."

Sears did not comply with the subpoena, and the commission filed an action in the district court of Shawnee County, under the provisions of K. S. A. 44-1004 (5) (Weeks, 1973), to secure an order directing Mr. Reynolds to produce the subpoenaed documents forthwith or to show cause why he should not be punished for contempt. On December 12, 1973, the district court issued an *ex parte* order directing Reynolds to produce the records for examination by an authorized representative of the commission or, in the alternative, to show cause why he should not be held in contempt.

Sears responded with a motion to quash the subpoena and to set aside the court's *ex parte* order. In its motion Sears alleged (1) it would be unduly burdensome to produce the lists within the time allotted; (2) that records of persons denied credit during the 60-day period involved had been destroyed; (3) the information was confidential, and could be waived only by the individuals concerned; and (4) the commission had no jurisdiction in the matter.

After a hearing, the trial court sustained the defendant's motion to quash as to the records of those persons who were denied credit, but otherwise overruled the motion. Sears has appealed. There is no cross-appeal.

At the outset, mention need be made concerning a matter of appellate procedure. In overruling, in part, the defendant's motion

to quash, the trial court made a finding that its order involved a controlling question of law as to which there was substantial ground for difference of opinion and that an immediate appeal might materially advance the ultimate termination of the litigation. Sears thereupon applied for leave to take an intermediate appeal pursuant to the provisions of K. S. A. 60-2102 (*b*) (Corrick, 1964) and Supreme Court Rule No. 5. (214 Kan. xxii.) This court granted permission to take an intermediate appeal, and directed the parties to brief the "jurisdictional question as to whether the Supreme Court can entertain this appeal." Accordingly, both parties have briefed and argued the jurisdictional question relying on the assumption that the appeal is intermediate in character.

We have come to the conclusion, however, that this court, and the trial court, as well as the parties, were mistaken in viewing the appeal as intermediate. Our error may have been due in part to the caption given the case in district court, *i. e.*, Mr. William V. Minner v. Sears, Roebuck and Company, but the collective eyes of this court should have been keen enough to have detected the misnomer.

This action was initiated by the commission to force compliance with its subpoena. Mr. Minner did not file this lawsuit; he merely filed the complaint which is before the commission. The only relief sought in *this* lawsuit is to compel Sears to comply with the subpoena. *This* lawsuit has nothing to do with the merits of Minner's complaint; it is the commission which ultimately must investigate and determine the merits of the complaint in the first instance. The only issue before the trial court was whether Sears, through its credit manager, should be required to comply with the commission's subpoena. The district court ruled on that issue, and that issue alone. The court overruled Sears' motion to quash, and ordered Sears to comply therewith in substantial part. That ruling, as we see it, is in effect a final order—it effectively disposed of the only issue before the trial court.

Since the court's order overruling Sears' motion to quash and directing Sears to produce the records is, in our opinion, "a final decision" within the purview of K. S. A. 60-2102 (*a*) (4) (Corrick, 1964), it was appealable as a matter of right. Accordingly, we consider the appeal as properly before us and we accept it as such.

Finally, we will gingerly flex our judicial muscle by amending the appellate title to reflect the proper parties to the lawsuit. In so doing we recognize that we impinge on the mandate of our

own rule, 6 (*q*), (214 Kan. xxvi), that appeals shall bear the same title here as in district court.

Having disposed of the peripheral procedural problems we pass on to matters of substance. Sears presents two basic issues on appeal. The first, in its words, is whether the commission had authority or jurisdiction to issue the subpoena. Or, to put the question in a somewhat different context, does a complaint such as Minner's come within the purview of the Kansas Act Against Discrimination (K. S. A. 44-1001 [Weeks, 1973] *et seq.*), to which we will refer hereafter as the Act.

Sears would give a negative answer to the question, regardless of how it is phrased. It argues that the commission was without statutory authority to accept the complaint or to issue the subpoena; that the complaint does not allege a discriminatory practice within the statute. We will first apply ourselves to determining this issue, leaving for later consideration the defendant's contention that compliance with the subpoena would violate the rights of privacy of persons not privy to this lawsuit, contrary to constitutional guarantees, and would subject Sears to actions for damages.

We believe it pertinent at the beginning to say that the Act does not reach this forum as a complete and total stranger. In three recent cases, *Yellow Freight System, Inc., v. Kansas Commission on Civil Rights,* 214 Kan. 120, 519 P. 2d 1092; *Atchison, T. & S. F. Rly. Co. v. Commission on Civil Rights,* 215 Kan. 911, 529 P. 2d 666; and *Atchison, T. & S. F. Rly. Co. v. Lopez,* 216 Kan. 108, 531 P. 2d 455, we considered various aspects of the subpoena powers vested in the commission. In each of those cases the plaintiff employer sought to enjoin the commission from enforcing its subpoena. In each case we upheld the commission's authority to subpoena witnesses, to compel their attendance and to require production of records and documents during investigation of alleged unlawful employment practices. Taken together they may be said to indicate a tendency on the part of this court to give the statute a broad interpretation.

We have not had occasion, however, to determine the precise question posed by Sears in its first point. Do the provisions of the Act apply to the area of consumer credit practices in a retail merchandising establishment? If such practices are not encompassed by the Act the commission would lack authority to investigate Minner's complaint or to issue the subpoena. In arguing that the extension or refusal of credit to a customer by a retail purveyor

of goods does not fall within the purview of the Act, Sears presents two grounds: (1) the area of consumer credit is not covered by the Act and (2) retail establishments are not places of public accommodation, as defined in the Act. Because these contentions are closely interrelated it will be difficult to separate them in the course of our discussion.

It is true the Act does not expressly mention the subject of consumer credit. Neither have we come across a case which deals with discrimination in the area of consumer credit in the context in which it appears here. We are nonetheless convinced that unfair credit practices violate the spirit and essential nature of the Act "to eliminate and prevent discrimination, segregation, or separation in all places of public accommodations covered by this act." (K. S. A. 44-1001 [Weeks, 1973].)

The trial court spoke on this phase of the case in clear and lucid language which bears repeating:

"The other question, which constitutes the basis of the complaint, deals with the issue of credit, or the denial of it, to a particular class of the public. Certainly, a denial of credit to one, or a class of the same, based solely upon race or color constitutes an unlawful discriminatory practice. It constitutes discrimination and segregation against persons and falls within the intent and purpose of the Act. A simply [sic] analogy to this question is to suppose a merchant downtown who offers and sells goods and services to the public posts a sign on his door—'We do not sell to any person belonging to . . . race.' Would anyone argue that this would not be an unlawful discriminatory practice by one engaged as a public accommodation?

"Whether it be a sale or denying credit would not alter the fact that this, if proven, constitutes prohibited conduct under the Act."

Sears calls attention to K. S. A. 44-1017 (Weeks, 1973) which provides it shall be unlawful for banks, building and loan associations, insurance companies and other companies, firms or persons engaged in making real estate loans, to deny a loan or to discriminate against any person in the terms and conditions of a loan on the basis of race, religion, color, sex, national origin or ancestry. It is to be inferred from this, the defendant argues, that the legislature considered loans an appropriate subject with respect to housing but not with respect to sales of merchandise in public accommodations. In other words, the argument goes, had the legislature intended the matter of credit to be included in the term "unlawful discriminatory practice" it would have said so, as it did in the Act respecting discriminatory housing practices.

The argument is artful but not convincing. Section 44-1017 is

an integral part of the Fair Housing Act adopted in 1970, five years after discriminatory practices were proscribed in areas of public accommodations. The 1970 Act added a new dimension to Kansas anti-discrimination laws, *i. e.*, housing and its attendant ramifications. The law relates to the sale and rental of real property as well as to real estate loans, it sets up its own procedures, defines its own unlawful acts and provides its own penalties. It is expressly declared supplemental to and a part of the Kansas Act Against Discrimination and it differs in numerous significant aspects from the earlier legislation in the anti-discrimination field.

In our judgment the enactment of 44-1017 as a section of the 1970 Fair Housing Act provides no basis for assuming a legislative intent to exclude consumer credit transactions from the 1965 law condemning discriminatory practices in places of public accommodations. This is so, we feel, even though credit transactions were not mentioned by name in the 1965 enactment.

It is well known that many retail sales are made on the basis of credit. So commonplace has become the consumer practice of buying merchandise on credit and paying for it later on the installment plan, that we believe judicial notice may be taken of the custom under K. S. A. 60-409 (*b*) (Corrick, 1964). See cases collected in 4 Vernon's Kansas Statutes Annotated, Fowkes, Harvey, Thomas, pp. 220, 221.) Credit has become a very useful tool in the field of retail merchandising; it inheres not only in the pricing structure but in the very process by which goods are moved from retailer to consumer. We would be rash, indeed, to say that discrimination in extending or withholding credit would not be a discriminatory practice of some magnitude in the public market place.

Sears would insist, however, that a retail establishment such as its Topeka store, does not fit within the category of "a place of public accommodation." To understand the defendant's position in this respect we must take a look at three sections of the Act. Minner has charged Sears with an unlawful practice within the meaning of K. S. A. 44-1009 (*c*) (1) (Weeks, 1973), which provides:

"(*c*) It shall be an unlawful discriminatory practice:

"(1) For any person, as defined herein, being the owner, operator, lessee, manager, agent or employee of any place of public accommodation to refuse, deny, or make a distinction, directly or indirectly, in offering its goods, services, facilities, and accommodations to any person as covered by this act because of race, religion, color, sex, national origin or ancestry, except where a distinction because of sex is necessary because of the intrinsic nature of such accommodation."

Sears next refers us to K. S. A. 44-1002 (Weeks, 1973), the definitions section of the act, directing our attention specifically to subsections (*h*) and (*i*) which read:

"(*h*) The word 'hotel,' 'motel' and 'restaurant' shall each have the meanings ascribed to them respectively by K. S. A. 36-101 and K. S. A. 1971 Supp. 36-301, and the term 'public accommodations' shall include any person as defined herein, who caters or offers his goods, services, facilities, and accommodations to the public, but shall not include a nonprofit fraternal or social association or corporation.

"(*i*) The term 'unlawful discriminatory practice' means any discrimination against persons in a hotel, motel, cabin camp, restaurant or trailer court and the segregation against persons in a place of public accommodations covered by this act by reason of their race, religion, color, sex, national origin, or ancestry. The term 'unlawful discriminatory practice' also means any discrimination against persons in a bar, tavern, barbershop, beauty parlor, theater, skating rink, bowling alley, billiard parlor, amusement park, recreation park, swimming pool, lake, gymnasium, mortuary, cemetery which is open to the public or on any public transportation facility.

"The term 'unlawful discriminatory practice' also means any discrimination against persons in the full and equal use and enjoyment of the services, facilities, privileges and advantages of any institution, department or agency of the state of Kansas or any political subdivision or municipality thereof."

As we understand defendant's argument, it goes like this: to determine what is meant by the term "place of public accommodation" as it is used in 44-1009 (*c*) (1) we must turn to the definitions of 44-1002 (*h*) and (*i*); that taken together (*h*) and (*i*) limit places of public accommodations to hotels, motels, cabin camps, restaurants and trailer courts, plus the sixteen facilities listed in the last sentence of subsection (*i*). We believe the term "place of public accommodation" is far more inclusive than that; in our opinion it contemplates such mercantile establishments as shops and stores, as well. In keeping with the broad public policy of eradicating the cancer of discrimination from our society, we interpret "public accommodations" to mean those places which are held out as open to the general public and which members of the public generally are invited to patronize and otherwise visit.

In an article entitled Commission Enforcement of State Laws Against Discrimination: A Comparative Analysis of the Kansas Act, 14 Kansas Law Review 29, the authors, Richard B. Dyson and Elizabeth D. Dyson, have this to say relative to the scope of present Kansas anti-discrimination statutes:

"Kansas established an 'Anti-Discrimination Commission' in 1953 to deal with employment discrimination, although its function was purely advisory and educative since it had no enforcement powers. In 1961, however, the agency,

renamed the Kansas Commission on Civil Rights, was given some enforcement powers, and in 1963 its jurisdiction was extended to cover a limited number of public accommodations. In 1965 further changes were made in its methods of enforcement and new public accommodations establishments were brought within its scope." (p. 30.)

In footnote 14 the foregoing text is amplified:

"Kan. Sess. Laws 1965, ch. 323, §§ 1-11. The public accommodations coverage of the act, newly defined in 1965, combines two different philosophies of statutory draftsmanship: it uses both an 'umbrella clause' and a specific enumeration. Such combinations have often raised the question whether the detailed listing really is exclusive, rendering the broad clause 'nugatory under the principle of *expressio unius est exclusio alterius*. Some civil rights statutes have been restricted in this way. See GREENBERG, RACE RELATIONS AND AMERICAN LAW 103-05 (1959). A careful reading of the Kansas act makes it clear, however, that its umbrella clause is not restricted by the enumeration. Section 2 (*h*) defines 'public accommodation' as 'any person, as defined herein, who caters or offers his goods, facilities, and accommodations to the public.' That is the umbrella clause. Then the next subsection, (*i*), defines 'unlawful discriminatory practice' as

any discrimination against persons in a hotel, motel, cabin camp, restaurant or trailer court *and* the segregation against persons *in a place of public accommodations* covered by this act by reason of their race, religion, color, national origin, or ancestry. The term 'unlawful discriminatory practice' *also* means any discrimination against persons in a bar, tavern, barbershop, beauty parlor, theater, skating rink, bowling alley, billiard parlor, amusement park, recreation park, swimming pool, lake, gymnasium, mortuary, cemetery which is open to the public or on any public transportation facility. (Emphasis supplied.)

Thus, the unlawful practices consist of discrimination in hotels, motels, etc., *and* in a public accommodation as broadly defined, and *also*—the key word— in the long list of enumerated facilities. The legislature probably intended to make sure that the enumerated facilities would be included within the general concept of public accommodations. Discrimination is prohibited, therefore, in all businesses that could reasonably be described as offering 'goods, facilities, and accommodations to the public.'" (pp. 30, 31.)

We concur in the analysis made by the authors Dyson. Moreover, we believe the conclusions they have drawn with respect to the reach of the Kansas Act are in accord with the modern trend of authority. In 87 A. L. R. 2d Anno: Civil Rights Statutes—Scope, § 2 [*b*], the writer of the annotation has this to say on the general subject:

"The courts have used a number of well-known rules of statutory construction to help them determine whether a place not specifically listed in the statute is within the coverage of the law. The early cases sought to apply to the words used by the statute the meaning of such words at common law, or they attempted to distinguish between 'public accommodations' and private

business. The rule most frequently applied was that of ejusdem generis under which only places of a like character to those listed in the statute could be found to be places of public accommodation or amusement. More recently, the question has been raised whether statutes which provide that the term 'place of public accommodation' shall be 'deemed to include' certain listed places are limited to the places so listed. The answer generally has been that the statute is not so limited." (p. 128.)

Again, in § 3 [c] of the same annotation we find the following observation:

"As a result of recent amendments, a number of statutes now provide that a 'place of public accommodation,' etc., as used in the statute, shall be 'deemed to include' certain places, the list usually being quite long. Defendants in a number of cases have argued that *only* the places listed may be considered within the statute. This argument has not met with much success. (p. 136.)

Supporting case law is not lacking. In *Sellers v. Philip's Barber Shop*, 46 N. J. 340, 217 A. 2d 121, complaints were filed against Mr. Gatti, the owner and operator of the shop, for violating the provisions of the New Jersey Law Against Discrimination. Gatti defended on the ground that a barber shop was not a place of public accommodation under the statute. In rejecting this claim, the New Jersey court said:

". . . He [Gatti] points out that a 'place of public accommodation' is not specifically defined in the statute. Instead of doing so, he says, the Legislature listed the business establishments which were to be considered as within the category. And since barber shops were not included, he contends the lawmakers intended to exclude them. We have dealt with the same claim in another context and have held that since N. J. S. A. 18:25-5 (1) ordains that a place of public accommodation 'shall include,' and then goes on to list a substantial number of business, occupational, recreational and educational enterprises, the specification is not a limitation but simply a general illustration of the type of enterprise intended to be within the boundaries of the law. Moreover, in light of the type of activity carried on in the places listed as examples of places of public accommodation, we have given the term a common sense definition, which in our judgment clearly portrays and effectuates the legislative intent. An establishment which caters to the public or by advertising or other forms of invitation induces patronage generally is a place of public accommodation, and cannot employ race, creed or color as a basis for refusing to serve members of the public who have accepted the invitation. . . ." (pp. 344, 345.)

A case from Massachusetts, *Local Finance Co. v. Massachusetts Commn. Against Discrimination*, 355 Mass. 10, 242 N. E. 2d 536, is enlightening. The finance company operated a loan business. The loan application form required the applicant to disclose whether he was white, Negro or of Spanish ancestry. The commission issued

a complaint alleging the company was engaging in discriminatory practices. Finance contended its place of business was not a "place of public accommodation" within the meaning of a statute defining the term as including *"any place . . . which is open to and accepts or solicits the patronage of the general public . . . whether or not it be* [one of several businesses listed].' The court said that the statutory language,

". . . [P]articularly when read in the light of the obviously broad legislative purpose, strongly indicates that the enumerated specific examples of 'places of public accommodation' do not restrict the preceding general statutory language or provide a basis for applying the principle of ejusdem generis.

. . . . . . . . . . . . . .

"In other jurisdictions, the current tendency of the decisions (although, of course, dealing with statutory language by no means uniform) is to give anti-discrimination statutes, generally comparable to § 92A, a broad, inclusive interpretation. The decisions place no undue emphasis on either the principle of ejusdem generis or the rule that penal statutes must be interpreted strictly. . . ." (pp. 13, 14.)

See, also, *Lambert v. Mandel's of California,* 156 C. A. 2d Supp. 855, 319 P. 2d 469; *Presley v. City of Monticello,* 395 F. 2d 675.

The history of anti-discrimination legislation in recent years appears to have been one of constantly expanding coverage. The Kansas experience illustrates the trend. The first Kansas Act Against Discrimination was adopted in 1961, although an anti-discrimination commission had been created in 1953, and although, also, a penal statute proscribing discrimination in certain limited areas had long been on the statute books.

The 1961 Act pertained to unfair labor practices; it was geared to "eliminate discrimination in all employment practices." Two years later, in 1963, the legislature amended the Act to apply also to "accommodations in hotels, motels, cabin camps and restaurants." It was not until 1965 that the Act, through amendment, was made to apply not only to lodgings and eating places but, in addition, to "places of public accommodation." In 1970 the Fair Housing Act was adopted, extending anti-discrimination legislation to the field of housing. Until 1972 discrimination because of race, religion, color, national origin or ancestry was proscribed in areas covered within the Act. In 1972 the word sex was added to the list and in 1974, physical handicap, giving further sweep to the Act.

Viewing Kansas Civil Rights legislation in the perspective of recent history, we discern a continuing intent on the part of the legislature to strengthen civil rights statutes and to enlarge the

areas of their coverage. We harbor little doubt that places of public accommodations were intended to include places where general retail trade is conducted and that in those places, distinctions are now not to be made based on race, religion, sex, physical handicap, ancestry or national origin.

Will compliance by Sears with the commission's subpoena *duces tecum* impermissibly invade the rights of privacy of parties not privy to this lawsuit and will it subject Sears to actions for damages?

The commission's subpoena called for Sears to produce a list of persons who applied for and received credit 30 days before and 30 days after January 6, 1973, plus any ratings concerning those persons received by Sears from credit bureaus. Obviously none of the persons who received credit from Sears during that time are interested in the Minner complaint nor are they connected with this lawsuit. The same might be said as to credit bureaus.

Questions going to confidentiality and constitutional rights of privacy were given searching examination in the very recent case of *Atchison, T. & S. F. Rly. Co. v. Lopez*, 216 Kan. 108, 531 P. 2d 455. Answers were framed in a comprehensive opinion prepared by Mr. Justice Schroeder, in which we held that disclosure could be compelled under the attending circumstances of that case. The issue of confidentiality raised here approximates in basic concept the privacy issue in *Lopez*.

Lopez was a Mexican-American. In applying for employment with the Santa Fe as a trackman he was asked to list the crimes of which he had been convicted. His answer showed no more than two. Lopez also consented to being fingerprinted, and he authorized Santa Fe to check his past record. He was placed on the payroll at the time of his application. The check made by Santa Fe disclosed twenty convictions for offenses running from traffic offenses to driving while drunk and assault and battery. On learning of this record Santa Fe disapproved Lopez' application and terminated his employment. Lopez filed a complaint alleging discrimination.

Santa Fe declined to make arrest and conviction records of its employees available to commission members, whereupon the commission issued a subpoena *duces tecum*, calling for all personnel records, including arrest and conviction records, of all employees hired as trackmen in the eastern division during the 1972 calendar year. Santa Fe then brought an action in district court to enjoin the commission from enforcing or seeking to enforce the subpoena.

Santa Fe strenuously urged that any disclosure of the arrest and conviction records of its employees would invade their rights of privacy and would subject Santa Fe to damage actions. In the *Lopez* opinion Justice Schroeder cites and discusses a number of United States Supreme Court decisions including two, *Griswold v. Connecticut*, 381 U. S. 479, 14 L. Ed. 2d 510, 85 S. Ct. 1678, and *Katz v. United States*, 389 U. S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507, in which constitutional rights of privacy were considered and passed upon. Respecting the constitutional shield against the invasion of personal rights, Justice Schroeder wrote:

". . . The basic requirement of the constitution and the courts is that an intrusion of a constitutional right is permissible if reasonable." (p. 119.)

After noting that in *Katz v. United States*, supra, the high court said: " '[T]he protection of a person's *general* right to privacy—his right to be let alone by other people—is, like the protection of his property and of his very life, left largely to the law of the individual States.' (pp. 350, 351.)" (p.\_\_\_\_.), Justice Schroeder proceeded to quote from the concurring opinion of Mr. Justice White in *Griswold* as to what invasions of privacy are constitutionally permissible:

" '. . . "Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling." *Bates v. Little Rock*, 361 U. S. 516, 524. See also *McLaughlin v. Flordia*, 379 U. S. 184. But such [state] statutes, if reasonably necessary for the effectuation of a legitimate and substantial state interest, and not arbitrary or capricious in application, are not invalid under the Due Process Clause. *Zemel v. Rusk*, 381 U. S. 1.' (pp. 503, 504.)" (p. 121.)

Mr. Justice Goldberg, whose concurrence in the *Griswold* case is also quoted in *Lopez*, makes the same point, in saying:

" '. . . The law must be shown "necessary, and not merely rationally related, to the accomplishment of a permissible state policy." *McLaughlin v. Florida*, 376 U. S. 184, 196. . . .' " (p. 121.)

Granting for the moment that disclosure of the credit ratings of customers who received credit may be an intrusion into their private matters, we believe that inspection of the records by the commission, properly safeguarded, is of compelling importance to the state in effectuating a "legitimate and substantial state purpose."

The conclusion we ultimately reached in the *Lopez* case was couched in the following words:

". . . The public policy of this State as declared in the Kansas Act Against Discrimination compels that the interests of the individuals affected

by the disclosure be subordinated in order 'to eliminate and prevent discrimination in all employment relations.' (K. S. A. 44-1001)." (p. 121.)

Although we deal here with discrimination in places of public accommodations rather than with discriminatory employment practices as in *Lopez* we deem the language equally appropriate to the present case.

Under K. S. A. 44-1005 (Weeks, 1973) the commisison is enjoined to treat as confidential all evidence gathered in the course of an investigation. This statutory provision has been supplemented by a rule of the commission (KAR 21-43-6), reading as follows: "The commission shall not disclose what has transpired in the course of its endeavors at conciliation and persuasion, per K. S. A. 44-1005. However, when executed, the final terms of a conciliation agreement may be disclosed. No officer, agent or employee of the commission shall make public with respect to a particular person without his consent information from reports obtained by the commission except as necessary to the conduct of further commission proceedings." We have no reason to assume that the members of the commission will violate the command of either the statute or the rule.

Sears further argues it would be subjected to damage actions at the hands of its customers under the provisions of 42 U. S. C. A. § 1983, should it supply the subpoenaed records. The federal statute reads:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Santa Fe made the same argument in *Lopez*, where it was answered in the following fashion:

"A fundamental requirement for sustaining a suit for damages under 42 U. S. C. § 1983 is that the citizen of the United States or other person within the jurisdiction thereof be deprived of '. . . any rights, privileges, or immunities secured by the Constitution and laws. . . .' Since we have determined that Santa Fe's disclosure of the subpoenaed information would not violate the constitutional rights of its employees, there is no basis for the employees to maintain a Section 1983 action against Santa Fe in a federal court. The broad sweep of the Federal Civil Rights Act is for all practical purposes identical to the broad sweep of the Kansas Act Against Discrimination, having as one of its directed purposes the elimination of discrimination in all employment relations. Under these circumstances we find it unnecessary to

pursue Santa Fe's argument that it would not be protected by proceeding 'under color of' state laws." (p. 124.)

We are satisfied with the reasoning of the above citation as providing an adequate response to the defendant's argument in this case.

Sears contends, however, it will incur liability for damages under both the federal and state Fair Credit Reporting Acts (15 U. S. C. A. § 1681, *et seq.*; K. S. A. 1974 Supp. 50-701, *et seq.*) We believe Sears is unduly alarmed on this score. Both acts contain provisions imposing civil liability on a consumer reporting agency or a user of information for willful or negligent failure to comply with any requirement of the acts. (15 U. S. C. A. § 1681n & § 1681o; K. S. A. 1974 Supp. 50-715 and 716.)

We would find it difficult to stigmatize compliance with a subpoena duly issued by an agency such as the commission, which was authorized by law to issue subpoenas, as either willful or negligent failure to comply with the requirements of either Act. Particularly would this be so where a court has issued an edict directing that compliance be made with the terms of the subpoena.

Moreover, § 1681b (1) of the federal code and 50-703 (*a*), the state statute, provide that a consumer reporting agency may furnish a consumer report in "response to the order of a court having jurisdiction to issue such an order." In *United States v. Bremicker,* 365 F. Supp. 701, an agent of the Internal Revenue Service issued a summons requiring the bank of which Bremicker was president, to produce for examination certain deposit, withdrawal and loan records on some of its depositors. On refusal of the bank to comply, application was made to the district court for enforcement of the summons.

Among other defenses advanced, the bank alleged it was prohibited by the Fair Credit Reporting Act from responding to the summons. As to this contention the court first observed the Act did not apply to tax investigations conducted by the Internal Revenue Department. The court then went on to say:

"Even if we assume for purposes of this case that the records requested here are covered by the Act, § 1681b (1) allows for their production 'in response to an order of a court having jurisdiction to issue such an order.' 15 U. S. C. § 1681b (1). Concededly, by virtue of §§ 7402 (*b*) and 7604 (*a*) the district court has jurisdiction to compel production pursuant to a summons. Again we note that the bank does not assert that it would not respond to a court order." (p. 703.)

Finally, we think it timely to observe that where records or documents of a confidential nature are produced in court in response to a subpoena or other court order, the court is vested with authority to issue such protective orders as it deems advisable to keep the information from prying eyes and to prevent its misuse. The commission frankly recognizes the court is possessed of that authority.

Protective orders are by no means unknown to the law. "In camera" inspection of proffered documentary evidence occurs with considerable frequency, especially in trials of a criminal nature. Perhaps the most widely known incident of "in camera" inspection occurred in connection with the "Watergate" trials. In *United States v. Nixon,* 418 U. S. 683, 41 L. Ed. 2d 1039, 94 S. Ct. 3090, a claim of confidentiality was asserted as to certain tapes which had been subpoenaed in *United States v. Mitchell,* then pending in the United States District Court for the District of Columbia. The President contended the tapes were privileged as being necessary to protect the confidentiality of communications between the President and his advisers. The Supreme Court said:

". . . [W]e find it difficult to accept the argument that even the very important interest in confidentiality of presidential communications is significantly diminished by production of such material for in camera inspection with all the protection that a district court will be obliged to provide." (p. 706.)

We have confidence that the able trial judge who heard this case will make such protective orders as may be necessary to protect the interests of persons whose substantial rights might be affected adversely by production of the subpoenaed records.

No error appears of record and the judgment of the district court is affirmed.