No. 50,128

THE WESLEY MEDICAL CENTER AND ST. JOSEPH MEDICAL CENTER, INC. *Appellants,* v. JAMES A. MCCAIN, SECRETARY OF HUMAN RESOURCES, STATE OF KANSAS, *Appellee.*

(597 P.2d 1088)

Opinion filed July 14, 1979.

*Martin R. Ufford,* of Boyer, Donaldson & Stewart, of Wichita, argued the cause for The Wesley Medical Center, and *Stephen M. Blaes,* of Blaes & Reals, of Wichita, argued the cause for St. Joseph Medical Center, Inc., and both were on the brief for the appellants.

*F. Duane Roberts,* of Topeka, argued the cause, and *J. Marcus Goodman,* of Topeka, was with him on the brief for the appellee.

The opinion of the court was delivered by

HERD, J.: This is an appeal by Wesley Medical Center and St. Joseph Medical Center, Inc. from a judgment of the Sedgwick County District Court affirming the decision of the Secretary of Human Resources assessing the appellants' 1975 unemployment contribution rates at 3.6% of wages paid.

The facts are not in dispute. Both plaintiff-appellants are hospitals located in Wichita, Kansas, and are non-profit organizations described in section 501(a) of the U.S. Internal Revenue Code, 1954, and as such are exempt from income taxes.

The plaintiffs became liable for taxes under Kansas Employment Security Law, K.S.A. 44-701 *et seq.*, January 1, 1972, as non-profit hospitals under K.S.A. 44-703($h$)(10) (L. 1971, ch. 180). Both plaintiffs elected to become contributing employers (K.S.A. 44-710[$e$]). For 1972, Wesley's rate was 1.26%, St. Joseph's was 1.68%; for 1973, rates for both were 2.22%; and for 1974, both were 1.7%. Those rates were for ineligible employers and were figured on industry wide experience.

By January 1, 1975, the plaintiffs had sufficient experience to be classified under K.S.A. 44-710($a$) and 44-710($c$) in accordance with their actual employment experience and the payment of unemployment benefits was charged against their reserve. They were now "eligible" employers under the act.

The Division of Employment of Kansas computed and assessed appellants' unemployment contribution rate to be 3.6% for the calendar year 1975. Notices were mailed and each plaintiff filed a request for review pursuant to K.S.A. 44-710b($a$). The cases were consolidated on review.

The administrative hearing was held on April 1, 1975. On July 18, 1977, the Secretary of Human Resources rendered his decision affirming the Division of Employment's computation of plaintiff's contribution rate to be 3.6%. He found that the adjusted rates for 1975 were prepared according to the statute, that the Division of Employment had followed generally accepted accounting and statistical procedures and that the rates had not been assessed discriminatorily. Both hospitals appeal from that decision.

Three of appellants' issues of error are constitutional attacks on the Kansas Employment Security Act. We have previously held a statute is presumed to be constitutional and all doubts must be resolved in favor of its validity. *Leek v. Theis,* 217 Kan. 784, 539 P.2d 304 (1975); *Rogers v. Shanahan,* 221 Kan. 221, 565 P.2d 1384 (1976); 16 Am. Jur. 2d, Constitutional Law § 175, pp. 399-401. We feel constrained to abide by the presumption.

In the first issue of error, appellants claim their contribution to the Unemployment Security Fund so far exceeds the benefits they have received it constitutes a confiscation of their property without due process of law contrary to the United States and Kansas Constitutions. The applicable constitutional provision is the Fourteenth Amendment to the U.S. Constitution, which states at § 1:

"[N]or shall any State deprive any person of life, liberty or property, without due process of law . . . ."

See also Kansas Const. Bill of Rights, § 18.

Due process had its origins in the Magna Charta and was written into the U.S. Constitution in the Fifth Amendment and imposed on the states in the Fourteenth Amendment in 1868. The Fifth Amendment is a limitation upon the powers of Congress while the Fourteenth Amendment is a limitation upon the powers of the states. We are concerned with the Fourteenth Amendment in this discussion. It encompasses both procedural and substantive due process but appellants have raised no questions about the procedural aspects of the Kansas Employment Security Act, K.S.A. 44-701 *et seq.* Therefore, we will confine this opinion to substantive due process.

It is said the due process clause has as its purpose insuring the fair and orderly administration of the laws. But it is incapable of precise definition because its meaning in each case depends upon the relation of the law authorizing it to the fundamental law limiting the power of the legislature. 16 Am. Jur. 2d, Constitutional Law § 545, p. 936.

In spite of the court's refusal to provide a precise definition of due process, we can examine a case by case interpretation of its meaning. In *Ross v. Moffitt,* 417 U.S. 600, 41 L.Ed.2d 341, 94 S.Ct. 2437 (1974), the court explained:

" 'Due process' emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the same situation may be treated." p. 609.

In *Kinsella v. Singleton,* 361 U.S. 234, 4 L.Ed.2d 268, 80 S.Ct. 297 (1960), the court said due process pertains to the denial of fundamental fairness, shocking to the universal sense of justice and deals neither with power nor with jurisdiction but with their exercise.

The court declined to disturb assessments of taxation unless they clearly transgress reasonable limits, *Great Northern Ry. v. Weeks,* 297 U.S. 135, 80 L.Ed. 532, 56 S.Ct. 426 (1936), and stated there must be something in legal effect which is the equivalent of intentional or fraudulent purpose nullifying the principles which safeguard the citizen's rights and property for a law to be violative of the due process clause.

The U.S. Supreme Court further amplified its interpretation of due process in *Richardson v. Belcher*, 404 U.S. 78, 84, 30 L.Ed.2d 231, 92 S.Ct. 254 (1971), saying if the goals sought by legislation were legitimate and the classification adopted was rationally related to achieving the goals, it didn't violate the due process clause.

This court then spoke to the issue in *Brown v. Wichita State University*, 219 Kan. 2, Syl. ¶ 7, 547 P.2d 1015 (1976) stating:

"In order for constitutional due process to be violated, the legislation before the court must bear no reasonable relation to a permissive legislative objective."

We have stated that the essence of due process is protection from arbitrary government, *Baker v. List and Clark Construction Co.*, 222 Kan. 127, 563 P.2d 431 (1977), and that if a statute is necessary for the effectuation of a legitimate and substantial state interest, and not applied in an arbitrary or capricious manner, it would not violate the due process clause. *Kansas Commission on Civil Rights v. Sears, Roebuck & Co.*, 216 Kan. 306, 532 P.2d 1263 (1975).

Let us test appellants' argument on the foregoing rules. The specific facts relied upon by appellants to support their allegation of a violation of the due process clause are: Wesley Medical Center paid unemployment contributions of $1,489,850.00 in 1975 and $30,531.00 in benefits were charged to its account. St. Joseph Medical Center, Inc. contributed $246,680.00 with only $3,139.00 benefits charged to its account, during the same period. They contend the discrepancy between cost and benefits prove the Employment Security Act is unconstitutional.

We do not agree. We think it is clear the relationship of taxes paid to the benefits received is not a per se violation of the due process clauses of the constitutions. Such discrepancies are unconstitutional only if there is no rational relationship between the tax and a legitimate and substantial state interest or goal, or if the statute is applied in an arbitrary or capricious manner.

The State's goals of the Employment Security Act are specifically set forth in K.S.A. 44-702, which states:

"[T]he public policy of this state is declared to be as follows: Economic insecurity, due to unemployment, is a serious menace to health, morals, and welfare of the people of this state. . . . The achievement of social security requires protection against this greatest hazard to our economic life. . . . The legislature, therefore, declares that in its considered judgment the public good and the

general welfare of the citizens of this state require the enactment of this measure, under the police powers of the state, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed."

We find there is a rational relationship between K.S.A. 1975 Supp. 44-710a, the taxing section of the act, and the State interest and goal as stated in K.S.A. 44-702. Appellants have contributed much more to the fund than their former employees have received back in compensation but a taxing system cannot be judged on a cost/benefit ratio. There are many benefits an employer receives which are not disclosed on such an evaluation. For instance, under the Employment Security Act an employer accumulates a reserve fund which ultimately permits him to obtain a 0% tax rate if he experiences a favorable employment record. In fact, Wesley has had such a favorable record its rate has improved from 3.6% in 1975 to 1.0% in 1977. A contributing employer receives the benefit of having its tax rate determined by its experience factor. *Bill George Chrysler-Plymouth, Inc. v. Carlton,* 216 Kan. 365, 532 P.2d 1351 (1975).

In *Bagley & Huntsberger, Inc. v. Dept. of L. & I.,* 34 Pa. Commw. Ct. 488, 491-492, 383 A.2d 1299 (1978), the employer presented a similar argument and the court, approving language from *Labe's Men's Shop v. Young,* 35 D. & C. 2d 135, 141-42, 82 Dauphin 383, 388-89 (1964), responded:

". . . The Unemployment Compensation Law may aptly be termed a statute having two somewhat related but nevertheless distinct and separate purposes. The one purpose is that of creating a fund out of which compensation benefits may be paid to persons who are unemployed through no fault of their own. To accomplish this purpose the act imposes contributions upon all employers, as defined in said act, which contributions are paid into the fund created for the payment of compensation benefits to eligible persons.

. . . .

"The other purpose or objective of this act is to afford to certain persons unemployment compensation benefits, and the provisions thereof establishing eligibility, amount and duration of such benefits accomplish this purpose. . . .

"The *quid pro quo* relationship of employer contributions to eligibility for compensation benefits which this 'injustice' suggests simply does not exist within the intent and purposes of the law . . . ."

Similar statutes to the Kansas law have been held constitutional as a valid exercise of the police power with its paramount objective that of relieving the distress of unemployment. 76 Am. Jur. 2d, Unemployment Compensation § 14, p. 889.

Finally, in this regard it has been shown that all contributing employers receive the benefit from their contributions of helping prevent unemployment and "to lighten its burden." It was well stated by Mr. Justice Stone in *Carmichael v. Southern Coal Co.,* 301 U.S. 495, 521-522, 81 L.Ed. 1245, 57 S.Ct. 868 (1937):

"[T]hose who pay the tax may not have contributed to the unemployment and may not be benefited by the expenditure. . . . Nothing is more familiar in taxation than the imposition of a tax upon a class or upon individuals who enjoy no direct benefit from its expenditure, and who are not responsible for the condition to be remedied."

Appellants also argue the legislation was applied in an arbitrary and capricious manner in violation of the due process clause. Does the discrepancy between cost and benefit establish such a violation? We think not. There is no evidence in the record to show the Department of Human Resources failed to use each step provided in the statute for determining rate. The trial court found as a matter of fact the rate was computed pursuant to the law and was not unreasonable, arbitrary or capricious.

In addition, it shouldn't be overlooked that each of the appellants had the privilege under K.S.A. 1975 Supp. 44-710(*e*) of becoming reimbursing employers and thereby avoid the employment tax by becoming a self insurer. Theoretically, under such an arrangement the cost and benefits balance. Such an employer pays its own unemployment benefits directly to its unemployed personnel. St. Joseph elected to exercise that option but now wants to be reinstated as an eligible contributing employer with its reserve fund restored. Wesley refused to elect to become a reimbursing employer.

We find appellants, by their actions, clearly show they do not consider the Unemployment Compensation Tax arbitrary, capricious or unreasonable. Neither do we. Appellants' first issue of error is without merit.

Appellants' second contention is the "array method" for determining unemployment tax rates pursuant to K.S.A. 1975 Supp. 44-710a is an unlawful delegation of legislative authority to an administrative agency in violation of the separation of powers doctrine of the Constitution. This issue requires a close examination of the Constitution and the case law interpreting it.

Article 2, § 1 of the Kansas Constitution provides: "The legislative power of this state shall be vested in a house of represent-

atives and senate." This court then made a detailed statement about the separation of powers in *Coleman v. Newby,* 7 Kan. *82, *86, *89 (1871), where it stated:

"The delegated power of the government is divided into three great branches,—the legislative, the judicial, and the executive,—and these three branches include all the delegated power of the government. What is not delegated remains with the people. Section 20, Bill of Rights. The legislative power is delegated to the legislature, (section 1, art. 2, Const.;) the judicial power to the judiciary, (section 1, art. 3, Const.;) and the executive power to the executive officers of the government, (sections 1, 3, art. 1, Const.). Under this grant of power it seems to be well settled that it is the peculiar province of the legislature to make the laws, of the judiciary to construe and expound them, and of the executive to execute and enforce them. [Citations omitted.] The great weight of authority seems to be that these three great powers or branches of power of government— the legislative, the judicial, and the executive—are distinct and separate from each other; [Citation omitted.] that they include all the delegated power of the state; (section 20, Bill of Rights;) and that each is delegated to its appropriate department, and can be exercised by no other department. [Citation omitted.] . . .

". . . When the people said, in the language of the constitution, (section 1, art. 2,) that 'the legislative power of the state shall be vested in a house of representatives and senate,' they meant *all* the legislative power. . . . These three powers having once been delegated by the people of the state to their respective departments, cannot again be delegated, but each must be exercised by the department to which it properly belongs. [Citations omitted.]

"While the legislature possesses all the legislative power of the state, and while it is true that they cannot delegate any portion of that power to any other body, tribunal, or person, yet it is generally found impracticable for them to exercise this power in detail. They may do so if they choose, or they may enact general provisions, and leave those who are to act under these general provisions to use their discretion in filling up the details."

The matter of delegation of legislative authority was masterfully interpreted by Mr. Justice Burch in *State, ex rel. v. Hines,* 163 Kan. 300, 308, 182 P.2d 865 (1947). The court said:

"[P]erhaps the act can be considered as valid insofar as the delegation of power is concerned, provided standards are fixed therein upon which a fact-finding administrative board is empowered to take action. But standards there must be. Mr. Justice Cardozo stated in his dissenting opinion in *Panama Refining Co. v. Ryan,* 293 U.S. 388, 79 L.Ed. 446, 'I concede that to uphold the delegation there is need to discover in the terms of the act a standard reasonably clear whereby discretion must be governed.' Mr. Chief Justice Hughes has stated that the power must be limited by boundaries, circumscribing the limitations upon that power. Standards are difficult to define because of variable nature thereof. They have been referred to as conditions, restrictions, limitations, yardsticks, guides, rules, broad outlines and similar synonymous expressions hereinafter set forth. It has been held that in the creation of administrative tribunals the power given them must be 'canalized' so that the exercise of the delegated power must be restrained by banks in a definitely defined channel."

Later in *State, ex rel. v. Fadely,* 180 Kan. 652, Syl. ¶ 7, 308 P.2d 537 (1957), the court stated:

"The legislature may not delegate its power to make laws but may enact a law in general terms which confers upon an officer or board administrative duties to enforce and apply the law, and, to accomplish that end, to ascertain the existence or nonexistence of some future fact, event or condition which the officer or board is required to ascertain; but, the statute must prescribe reasonably clear standards by which those vested with the duty to make the statute operate will do so in the manner intended."

Mr. Chief Justice Hughes delineated the position of the U.S. Government in *Panama Refining Co. v. Ryan,* 293 U.S. 388, 432, 79 L.Ed. 446, 55 S.Ct. 241 (1935), where he stated:

"[W]e are concerned with the question of the delegation of legislative power. . . . As the court said in *Wichita Railroad & Light Co. v. Public Utilities Comm'n.,* 260 U.S. 48, 59 [67 L.Ed. 124, 130, 43 S.Ct. 51]: 'In creating such an administrative agency the legislature, to prevent its being a pure delegation of legislative power, must enjoin upon it a certain course of procedure and certain rules of decision in the performance of its function'."

The doctrine of the separation of powers is a fundamental principle insuring the checks and balances essential to a constitutional democracy, such as ours. It was well stated in *Coleman* the lawmaking function is delegated by the people, through the constitution, to the legislature and cannot be re-delegated. However, it has been held permissible to enact a law in general terms and delegate the power to apply it to an executive agency under standards and guidelines provided by the legislature. *State, ex rel. v. Fadely,* 180 Kan. 652.

In the instant case, the people of Kansas adopted Article 7, § 5, of the constitution: "The state may provide by law for unemployment compensation and contributory old-age benefits and may tax employers and employees therefor . . . ." under the authority of which the Employment Security Act, K.S.A. 44-701 *et seq.,* was passed. In the context of appellants' second specification of error they attack one section, K.S.A. 1975 Supp. 44-710a, of the act as being unconstitutional on the grounds it amounts to legislation by an administrative agency—The Department of Human Resources.

From the cases, cited herein, we know the legislature is prohibited from delegating its lawmaking authority but may delegate the power to apply a law to an administrative agency if it provides

adequate standards and guide rules to the agency. *State, ex rel., v. Hines,* 163 Kan. 300.

Let us examine K.S.A. 1975 Supp. 44-710a to determine if it provides an adequate standard and guideline to the Department of Human Resources to meet the constitutional requirements. K.S.A. 1975 Supp. 44-710a provides a method of classifying contributing employers according to experience based on a computed reserve ratio. It further provides a method for determining 21 approximately equal rate groups based on reserve ratios. The legislature also provides a method and schedule for determining the planned yield and rates which are to range from 0% to 3.6% on taxable wages to fund the planned yield.

The foregoing is an abbreviated summary of a 2¼ page statute which sets the standard and guideline provided by the legislature to the Department of Human Resources for computing the unemployment tax rates of contributing employers. The question is: Does the legislative guideline provided by K.S.A. 1975 Supp. 44-710a comply with the constitutional restrictions governing the delegation of powers?

73 C.J.S., Public Administrative Bodies and Procedure § 30, p. 325, provides some assistance in answering the question:

"Notwithstanding the general rule prohibiting the delegation of legislative functions to administrative bodies, an admixture of governmental powers may be conferred on an administrative officer or board, if there is no delegation of actual legislative power or complete surrender of judicial review. Accordingly, where the legislature sufficiently prescribes a policy, standard, or rule for the guidance of the administrative body, or otherwise confines it within reasonably definite limits, authority may be delegated to the administrative body to carry out the legislative purposes in detail, and to exercise administrative power to regulate and control. Moreover, administrative officers may be authorized to exercise administrative discretion in the application of laws enacted by the legislature, and such discretionary power delegated to an administrative agency is not 'legislative' in violation of the Constitution, if the law furnishes a reasonably clear policy or standard of action, which controls and guides the administrative officers in ascertaining the operative facts to which the law applies so that the law takes effect on such facts by virtue of its own terms and not according to whim or caprice of administrative officers."

We can not imagine a more detailed guideline for administering a law than that provided in K.S.A. 1975 Supp. 44-710a. The administrative agency was delegated only the task of computing the tax rate pursuant to the legislative formula. We see nothing in the "array method" of computation involving administrative dis-

cretion which could be called whim or caprice. We are of the opinion the legislature did not delegate legislative authority to the Department of Human Resources in violation of the constitution.

As a parting shot under the second issue of error, appellants argue the "array method" of computing contribution rates under K.S.A. 1975 Supp. 44-710a was not followed by the Department of Human Resources in determining appellants' rate. This is a question of fact. On appeal this court's jurisdiction is confined to questions of law if the Secretary of Human Resources' findings are supported by some evidence, absent fraud. K.S.A. 1978 Supp. 44-710b($b$). There is no allegation or evidence of fraud against the Secretary of Human Resources and we find there is evidence to support his findings. The findings of the Secretary of Human Resources will therefore not be disturbed. We are of the opinion appellants' second issue of error is without merit.

Appellants argue as a third issue of error, the "array method" of computing unemployment tax rates pursuant to K.S.A. 1975 Supp. 44-710a establishes improper legislative classifications of contributing employers resulting in deprivation of equal protection of the law contrary to the Fourteenth Amendment to the United States Constitution and Article 7, § 5 of the Kansas Constitution. The Fourteenth Amendment states:

"[N]or shall any State . . . deny to any person within its jurisdiction the equal protection of the laws." § 1.

Article 7, § 5 of the Kansas Constitution provides: "The state may provide by law for unemployment compensation and contributory old-age benefits and may tax employers and employees therefor . . . ."

Appellants' constitutional challenge does not go to the Kansas constitutional provision since it is merely a delegation of unlimited authority to the legislature to provide unemployment compensation and tax for it. If there are limitations to the legislative authority, it is provided by the Fourteenth Amendment of the U.S. Constitution. We will therefore confine our discussion of this issue of error to the equal protection clause of the Fourteenth Amendment.

The equal protection clause of the Fourteenth Amendment was previously considered only as a part of due process. The Fifth Amendment has no equal protection provision. However, at the

time of the adoption of the Fourteenth Amendment it was feared former slaves would be separately classified for punitive measures by the states so Congress specifically spelled out the equal protection provision. Mott, Due Process of Law § 105, p. 275 (1926). By judicial construction equal protection has been imposed on the Congress under the Fifth Amendment making due process and equal protection virtually indistinguishable.

In *Ross v. Moffitt,* 417 U.S. 600, 609, 41 L.Ed.2d 341, 94 S.Ct. 2437 (1974), the court defined equal protection as follows: " 'Equal protection' . . . emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable . . . ."

Appellants argue the "array method" of computing unemployment taxes unreasonably classifies distinguishable employers in the same rate assessment bracket. The computation procedure does not distinguish between those employers with good or those with poor unemployment records.

Let us examine the "array method" of computation in light of this accusation. It is provided for in K.S.A. 1975 Supp. 44-710a. According to Webster's New International Dictionary 152 (2d ed. 1935) "array" means to place in order. K.S.A. 1975 Supp. 44-710a requires contributing employers be placed in rate groups and then divided into 21 approximately equal parts based on reserve ratio and that rates be figured from 0% to 3.6% of taxable wages. The reserve ratio is computed by dividing an employer's account balance by its average taxable payroll.

Employers in rate group 1 (those with most favorable reserve ratio) have 0% rate. They are eliminated from computation. Those with least favorable reserve ratio are given the maximum rate— 3.6% of taxable wages. In 1975 rate groups 18 to 21 inclusive were assigned a 3.6% rate. Next, after the tax produced by groups 18 and 21 is subtracted from the planned yield, the balance must be collected from rate groups 2 to 17 inclusive.

Appellants argue the method of computing the tax classifies employers with a good reserve ratio in the same rate group with employers who have an unfavorable reserve ratio; both paying the maximum rate. In 1975, Wesley Medical Center and St. Joseph Medical Center were in the same rate group with the construction industry. Hospitals have stable employment histories while the construction industry has a bad employment record

because of its seasonal nature. The argument is partially correct but misleading. Appellants' good employment experience soon qualified them for the lower rate.

Appellants also maintain all contributing employers will soon be placed in either the 0% rate group or the 3.6% rate group. They argue the demands of a high planned yield coupled with a large group of contributing employers qualifying by experience and rate reserve for 0% rate group will require all remaining to pay the maximum rate. They contend such classifications are arbitrary and capricious and therefore unconstitutional. Appellants' argument concerning future rates is speculative and unsupported by any evidence, and therefore cannot be considered by this court. However, appellants' classification in the maximum rate group with employers of a less favorable reserve ratio must be tested on the constitutional standard.

It is a well established rule of law that legislative classification in tax matters is presumed to be valid and will not be interfered with by the judiciary in the absence of fraud, corruption or arbitrary conduct. *Gorges Chrysler-Plymouth, Inc. v. Cobler,* 212 Kan. 664, 512 P.2d 504 (1973); *Gordon v. Hiett,* 214 Kan. 690, 522 P.2d 942 (1974).

71 Am. Jur. 2d, State and Local Taxation §§ 170, 171, pp. 491-494 has the following comment:

"Neither the Fourteenth Amendment of the Federal Constitution nor the equality and uniformity requirements of the state constitutions prohibit the making of classifications in state legislation relating to taxation. The power of a state to make reasonable and natural classifications for purposes of taxation, it has been said, is clear and not questioned. Such classifications may be made with respect to the subjects of taxation generally, the kinds of property to be taxed, the rates to be levied or amounts to be raised, or the methods of assessment, valuation, and collection. Granting the power of a state to make classifications in tax matters, it has been said, we must then grant the right to select the differences upon which the classification shall be based."

"The power to make classifications with respect to taxation is with the legislature in the first instance, and its discretion in the matter is very broad and covers a wide range. In this connection, it has been variously said that in taxation there is a broader power of classification than in some other exercises of legislation . . . ."

"Legislative classifications in tax matters are presumptively valid, the burden being on the challenger to prove such classifications do not rest upon a reasonable basis, and will not be disturbed by the judiciary in the absence of unreasonable, discriminatory, or arbitrary action."

In *Carmichael v. Southern Coal Co.,* 301 U.S. 495, a case we

cited in the due process discussion and which we again rely upon with respect to equal protection, the constitutionality of the Unemployment Compensation Law was questioned. Mr. Justice Stone stated for the court:

"It is not a valid objection to the present tax, conforming in other respects to the Fourteenth Amendment, and devoted to the public purpose, that the benefits paid and the persons to whom they are paid are unrelated to the persons taxed and the amount of the tax which they pay—in short, that those who pay the tax may not have contributed to the unemployment and may not be benefited by the expenditure. . . . Nothing is more familiar in taxation than the imposition of a tax upon a class . . . who enjoy no direct benefit from its expenditure, and who are not responsible for the condition to be remedied." pp. 521-522.

In *Finkel, Nadler and Goldstein v. Levine,* 46 App. Div. 2d 196, 198, 361 N.Y.S.2d 941 (1974), it was stated:

"The decision made by the Legislature to distribute the cost of the benefits among the various base period employers is not without some justification since it can reasonably be said that there is a nexus between such employments and the amount of benefits to which claimant would be entitled. The mere fact that inequities may occasionally arise do not provide a sufficient basis for striking down the legislation as unconstitutional. . . .

"In this instance, we are without the power to question the wisdom of this legislative means of distributing the costs of unemployment insurance benefits since it cannot be said that the measures are so extreme as to be arbitrary."

It has also been held that classification for tax purposes to be valid must have some reasonable relationship to the object or purpose of the legislation. *Ohio Oil Co. v. Conway,* 281 U.S. 146, 74 L.Ed. 775, 50 S.Ct. 310 (1930).

After carefully reviewing the facts and law in this case we are of the opinion the Kansas Employment Security Act does not violate the equal protection clause of the Fourteenth Amendment of the U.S. Constitution. The classification of contributing employers bears a reasonable relationship to the purpose of the legislation. And though there are inequities in the rate group classification they are not arbitrary, unreasonable, capricious or fraudulent. The act provides each employer the opportunity to improve his rate classification by showing a favorable employment record. For instance, Wesley Medical Center's contribution rate improved from 3.6% in 1975 to 1.0% in 1977. We find no merit to appellants' third issue of error.

Finally, as a fourth issue of error appellants argue the two year and three month delay between the administrative hearing and the Secretary of Human Resources' decision thereon was an

oppressive and capricious abuse of discretion. We find the delay by the Secretary in rendering his decision unconscionable but in the absence of proof of damage to appellants, it is harmless error.

The judgment is affirmed.