No. 47,739

KANSAS COMMISSION ON CIVIL RIGHTS, *Appellee*, v. R. G. HOWARD AND JAMES FREEL, CHIEF OF POLICE OF THE CITY OF TOPEKA, *Appellants.*

(544 P. 2d 791)

Opinion filed December 13, 1975.

*Ronald R. Hein,* assistant city attorney, argued the cause, and *Dan E. Turner,* city attorney, was with him on the brief for the appellants.

*Charles S. Scott,* of Topeka, argued the cause, and *Curt T. Schneider,* attorney general, and *Roger W. Lovett,* of Topeka, were with him on the brief for the appellee.

The opinion of the court was delivered by

FOTH, C.: The issue in this case is whether the Kansas commission on civil rights has the authority to entertain and investigate a complaint charging a city police officer with an unlawful discriminatory practice, based on the officer's decision to arrest the com-

plainant and on the treatment afforded the complainant during the arrest and the time he is in custody.

On August 1, 1972, Wayne A. Lewis filed such a complaint with the commission, naming as respondents the Topeka police department and one of its officers. In it he identified himself as a black American who worked and attended Topeka High School as a junior. He recounted an incident in which he alleged in substance: The officer followed him from a gasoline station in a patrol car and stopped his car with no reason; after checking Lewis' driver's license and car tags and finding them legal, the officer called him names, offered to fight him, and shone a flashlight in his eyes in an harassing manner; upon finding Lewis with his eyeglasses in his hands the officer arrested him for violating a license restriction requiring him to wear glasses when driving. Upon arriving at the police station, Lewis alleged, the officer twisted the skin on his back, called him names and indulged in racial slurs. Other officers joined in taunting, threatening and insulting him, he said. He concluded his complaint by stating:

"I hereby charge the Topeka Police Department and its representatives with violation of the Kansas Act Against Discrimination in that I was denied the full and equal use of their services and advantages because of my race."

A copy was served on the respondent officer and the Topeka police department, and the commission undertook to investigate the complaint. On September 10, 1973, it served a subpoena on the Topeka chief of police seeking the personnel and arrest records of the respondent officer, the disposition of the department's restricted driver's license arrests for a two year period, and the duty roster for the day of the alleged incident. When the records asked for were not forthcoming the commission obtained under K. S. A. 44-1004 (5) an *ex parte* order from the Shawnee county district court compelling production.

The police department responded with a motion to suppress, asserting that the commission had no jurisdiction over the subject matter of the complaint or to issue the subpoena, and therefore the court had no jurisdiction to enter its enforcement order.

Upon first consideration the trial court agreed with the respondents, finding that the complaint "does not allege acts which come within the purview and jurisdiction of the Kansas Commission on Civil Rights, because K. S. A. 1972 Supp. 44-1009 (c) (3) relates to unlawful employment practices." The commission filed a motion to reconsider which was sustained. The trial court reversed its po-

sition, found that the process of making an arrest is covered by the act, and ordered the chief of police to comply with the subpoena forthwith. The respondents have appealed, and the compliance order was stayed pending the appeal.

We are not concerned in this case with the truth of the complaint. We are only concerned with whether the nature of its allegations are such as to give the commission jurisdiction to investigate it.

It appears settled that the commission's jurisdiction to investigate a complaint depends on whether it alleges a violation of the Kansas act against discrimination. Thus, in *Kansas Commission on Civil Rights v. Sears, Roebuck & Co.*, 216 Kan. 306, 532 P. 2d 1263, the commission had received a complaint from one William V. Minner alleging discrimination in the extension of retail credit. At issue was the commission's authority to investigate the complaint by way of subpoena. The first question to be answered, the court said, was: "Do the provisions of the Act apply to the area of consumer credit practices in a retail merchandising establishment? If such practices are not encompassed by the Act the commission would lack authority to investigate Minner's complaint or to issue the subpoena." (*Id.*, at 310.)

The real question, then, is whether the act covers governmental conduct in areas other than employment, public accommodations and housing. The court has concluded that it does not.

The policy of the state and the purposes of the act are set forth in K. S. A. 1974 Supp. 44-1001:

"This act shall be known as the Kansas act against discrimination. It shall be deemed an exercise of the police power of the state for the protection of the public welfare, safety, health and peace of the people of this state. The practice or policy of discrimination against individuals *in employment relations, in relation to free and public accommodations or in housing* by reason of race, religion, color, sex, physical handicap, national origin or ancestry is a matter of concern to the state, since such discrimination threatens not only the rights and privileges of the inhabitants of the state of Kansas but menaces the institutions and foundations of a free democratic state. It is hereby declared to be the policy of the state of Kansas to eliminate and prevent discrimination *in all employment relations,* to eliminate and prevent discrimination, segregation, or separation *in all places of public accommodations* covered by this act, and to eliminate and prevent discrimination, segregation or separation *in housing.*

"It is also declared to be the policy of this state to assure equal opportunities and encouragement to every citizen regardless of race, religion, color, sex, physical handicap, national origin or ancestry, in securing and holding, without discrimination, *employment* in any field of work or labor for which he is properly qualified, to assure equal opportunities to all persons within this state to full

and equal *public accommodations,* and to assure equal opportunities *in housing* without distinction on account of race, religion, color, sex, physical handicap, national origin or ancestry. It is further declared that the opportunity to secure and to hold *employment,* the opportunity for full and equal *public accommodations* as covered by this act and the opportunity for full and equal *housing* are civil rights of every citizen.

"To protect these rights, it is hereby declared to be the purpose of this act to establish and to provide *a state commission having power to eliminate and prevent segregation and discrimination,* or separation *in employment, in all places of public accommodations* covered by this act, *and in housing* because of race, religion, color, sex, physical handicap, national origin or ancestry, either by employers, labor organizations, employment agencies, realtors, financial institutions or other persons as hereinafter provided." (Emphasis added.)

It will be seen that the legislature mentions the three areas of coverage (employment, public accommodations and housing) no less than five times in its statement of policy and purpose. In addition, when conferring specific powers on the commission in K. S. A. 1974 Supp. 44-1004 it provided:

"The commission shall have the following functions, powers and duties:

.  .  .  .

.  .  .  .

.  .  .  .

"(4) To receive, initiate, investigate, and pass upon complaints alleging discrimination *in employment, public accommodations and housing* because of race, religion, color, sex, physical handicap, national origin or ancestry." (Emphasis added.)

Our previous decisions construing the act have assumed that its coverage was limited to those three areas. See, *e. g., Jarvis v. Kansas Commission on Civil Rights,* 215 Kan. 902, 903, 528 P. 2d 1232; *Atchison, T. & S. F. Rly. Co. v. Commission on Civil Rights,* 215 Kan. 911, 916-17, 529 P. 2d 666; *Atchison, T. & S. F. R¹y. Co. v. Lopez,* 216 Kan. 108, 113, 531 P. 2d 455.

In support of its claim of jurisdiction here the commission relies on a 1972 amendment to the act's definition of the term "unlawful discriminatory practice." Prior to the 1972 amendment, K. S. A. 44-1002 (*i*) defined an unlawful discriminatory practice as discrimination or segregation in some twenty-one specific types of business establishment or facility, or in "a place of public accommodations covered by this act." The 1972 amendment (L. 1972, ch. 194, § 2) added the following language:

"The term 'unlawful discriminatory practice' also means any discrimination against persons in the full and equal use and enjoyment of the services, facili-

ties, privileges and advantages of any institution, department or agency of the state of Kansas or any political subdivision or municipality thereof."

By the same act virtually the identical language was also added to K. S. A. 44-1009 (L. 1972, ch. 194, § 7). As amended, the section reads:

"(c) It shall be an unlawful discriminatory practice:

.  .  .  .

.  .  .  .

"(3) For any person, as defined herein, to refuse, deny, make a distinction, directly or indirectly, or discriminate in any way against persons because of the race, religion, color, sex, national origin or ancestry of such persons in the full and equal use and enjoyment of the services, facilities, privileges and advantages of any institution, department or agency of the state of Kansas or any political subdivision or municipality thereof."

On the face of it it might appear that this language extended the act's coverage to the "services, facilities, privileges and advantages" of a governmental agency in any area of activity. But, "[i]n order to ascertain the legislative intent, courts are not permitted to consider only a certain isolated part or parts of an act but are required to consider and construe together all parts thereof *in pari materia*. When the interpretation of some one section of an act according to the exact and literal import of its words would contravene *the manifest purpose of the legislature, the entire act should be construed according to its spirit and reason,* disregarding so far as may be necessary the strict letter of the law." (*Claflin v. Walsh,* 212 Kan. 1, 8, 509 P. 2d 1130. Emphasis added.) See also, cases collected in 9 West's Kansas Digest, *Statutes,* § 205, and 5 Hatcher's Kansas Digest (Rev. Ed.), *Statutes,* § 77.

Construing the act as a whole, the court is unable to find from the 1972 amendment any legislative intent to extend the scope of the act beyond those three areas which are stated and restated to be the areas of primary legislative concern. The amendment is equally susceptible, in the court's view, of being interpreted as a clarifying measure, designed to make clear that governmental as well as private action is covered in the three areas covered by the act.

At best the amendment appears to the court to be ambiguous. If by these two small amendments the legislature intended to extend the act and the commission's jurisdiction into an area previously foreclosed, more appropriate and explicit language could and should have been employed. If a wholly new purpose was meant to be added to the act, 44-1001 could easily have been amended to say so.

The prior history of the act reflects a relatively consistent legislative pattern of enacting such amendments each time a new area was added to the act's coverage. (The history of such previous extensions is recounted in *Kansas Commission on Civil Rights v. Sears, Roebuck & Co.*, supra.) The failure to amend the "purpose" section to include the claimed new purpose involved here appears to the court persuasive evidence that no such legislative intent existed.

The result is a holding that the act does not cover, and the commission has no authority to investigate, governmental activities which do not involve employment relations, public accommodations or housing.

The question remains whether a discriminatory arrest, as alleged here, falls into any of those three categories. It seems apparent that employment and housing are not involved. Neither, in the court's view, is such a police function a matter of "public accommodation." K. S. A. 44-1002 (*h*), (now L. 1975, ch. 264, § 1 [*h*]) limits "public accommodations" covered by the act to:

". . . [A]ny person as defined herein, who caters or offers goods, services, facilities, and accommodations to the public, but shall not include a nonprofit fraternal or social association or corporation."

In *Kansas Commission on Civil Rights v. Sears, Roebuck & Co.*, supra, this court discussed at length the meaning of the term "public accommodations," which is generally interpreted to mean:

". . . [T]hose places which are held out as open to the general public and which members of the public generally are invited to patronize and otherwise visit." (216 Kan. at 313.)

The public is not invited to "patronize or otherwise visit" a municipal police department in the sense the term is used in the Act. A police department's law enforcement activities are therefore beyond the investigatory jurisdiction of the commission.

Finally, it may be noted that the parties devoted a large portion of their respective briefs to the question of whether an arrest is a "service" of the police department, so that if it is discriminatorily made it would be an unlawful discriminatory practice. The question is not free from difficulty. However, in view of the court's disposition of the case it need not be decided at this time.

The judgment is reversed and the case is remanded with directions to set aside the enforcement order and quash the subpoena.

APPROVED BY THE COURT.

MILLER, J., not participating.

PRAGER, J., I respectfully dissent. The majority of the court have strictly construed the Kansas anti-discrimination legislation in direct opposition to the mandate of the legislature that the provisions of the act should be construed liberally. (K. S. A. 44-1006 [Weeks 1973].) By this decision the majority have withdrawn from the jurisdiction of the Kansas Commission on Civil Rights an extremely important area of discriminatory practices which persist at times in our society today. In my judgment the majority have failed to give due consideration to the history of anti-discrimination legislation in Kansas and by strict construction have nullified and voided some of its basic objectives.

In determining the difficult questions presented in this case it is helpful to bear in mind the recent history of the Kansas anti-discrimination legislation discussed in *Kansas Commission on Civil Rights v. Sears, Roebuck & Co.*, 216 Kan. 306, 532 P. 2d 1263. We there held that a retail store was a "place of public accommodation" even though not one of those places was specifically named in the act. Therefore, we said, the improperly motivated denial of retail credit would be an "unlawful discriminatory practice" under the act. In reaching that conclusion we cited our prior cases, noting of them that, "Taken together they may be said to indicate a tendency on the part of this court to give the statute a broad interpretation." (p. 310.) In the opinion Mr. Justice Fontron pointed out the constantly expanding scope of the act in the following language:

"The history of anti-discrimination legislation in recent years appears to have been one of constantly expanding coverage. The Kansas experience illustrates the trend. The first Kansas Act Against Discrimination was adopted in 1961, although an anti-discrimination commission had been created in 1953, and although, also, a penal statute proscribing discrimination in certain limited areas had long been on the statute books.

"The 1961 Act pertained to unfair labor practices; it was geared to 'eliminate discrimination in all employment practices.' Two years later, in 1963, the legislature amended the Act to apply also to 'accommodations in hotels, motels, cabin camps and restaurants.' It was not until 1965 that the Act, through amendment, was made to apply not only to lodgings and eating places but, in addition, to 'places of public accommodation.' In 1970 the Fair Housing Act was adopted, extending anti-discrimination legislation to the field of housing. Until 1972 discrimination because of race, religion, color, national origin or ancestry was proscribed in areas covered within the Act. In 1972 the word sex was added to the list and in 1974, physical handicap, giving further sweep to the Act.

"Viewing Kansas Civil Rights legislation in the perspective of recent history, we discern a continuing intent on the part of the legislature to

strengthen civil rights statutes and to enlarge the areas of their coverage. . . ." (pp. 316-317.)

We thus recognized the general areas into which the act had spread—from employment to specific public accommodations, to all public accommodations, to housing. What was not dealt with there, because the issue was not involved, was the spread of the act's coverage to include governmental agencies. As pointed out by Mr. Justice Fontron it was not until 1963 that the legislature extended the act to apply to hotels, motels, cabin camps, and restaurants. In 1965 the act was amended to apply not only to motels and eating places but places of "public accommodations", which term was declared to include any person who caters or offers his "goods, facilities, and accommodations to the public, but shall not include a nonprofit fraternal or social association or corporation." It is important to note that this 1965 definition of public accommodations did not include the term "services". (Laws of 1965, ch. 323, § 2 [h].)

In 1970 the definition of "public accommodations" was expanded to include "any person . . . who caters or offers his goods, *services*, facilities, and accommodations to the public, . . ." (Emphasis supplied.) (Laws of 1970, ch. 192, § 1 [h].) At this time governmental agencies were not specifically brought within the application of the act.

That change was effected by the enactment of chapter 194, Laws of 1972. Among other things that act enlarged the definition of the term "unlawful discriminatory practice" found in K. S. A. 44-1002 (i) and reorganized K. S. A. 44-1009, which proscribed a number of unlawful acts. Prior to the 1972 amendment 44-1002 (i) defined an unlawful discriminatory practice as discrimination or segregation in some twenty-one specific types of business establishments or facilities or in a place of public accommodations covered by this act. The 1972 amendment Laws of 1972, ch. 194, § 2 (i) added the following language to 44-1002 (i):

"The term 'unlawful discriminatory practice' also means *any* discrimination against persons in the full and equal use and enjoyment of the *services*, facilities, privileges and advantages of *any* institution, department or agency of the state of Kansas or *any* political subdivision or municipality thereof." (Emphasis supplied.)

The 1972 act in section 7 (c) of chapter 194, also amended 44-1009 to expand the term "unlawful discriminatory practice" to include a new section (c) (3) as follows:

"44-1009

. . . . . . . . . . . . . .

"(c) It shall be an unlawful discriminatory practice:

. . . . . . . . . . . . . .

"(3) For any person, as defined herein, to refuse, deny, make a distinction, directly or indirectly, or discriminate in any way against persons because of the race, religion, color, sex, national origin or ancestry of such persons in the full and equal use and enjoyment of the *services*, facilities, privileges and advantages of any institution, department or agency of the state of Kansas or any political subdivision or municipality thereof." (Emphasis supplied.)

Paragraph (3) is the new addition. Under well-known rules of statutory construction this amendment, together with the amendment of 44-1002 (*i*), must be presumed to have effected some significant change in the statute. (*Curless v. Board of County Commissioners*, 197 Kan. 580, 587, 419 P. 2d 876; *Shapiro v. Kansas Public Employees Retirement System*, 211 Kan. 452, 507 P. 2d 281.) Obviously some sort of conduct was now an "unlawful discriminatory practice" under the act which would not have been covered prior to the amendment. It is clear to me that this sequence of amendments discussed above expressed the legislative intent that the term "public accommodations" should be expanded to vest in the Kansas Commission on Civil Rights the authority to investigate alleged unlawful discriminatory practices in the use and enjoyment of any services offered by any governmental agency to the public since by the amendment of 1970 the statutory definition of "public accommodations" was enlarged to include services offered to the public.

Applying a strict construction to these statutes the majority have concluded that the act does not mean what it says since the legislature in 1972 did not amend K. S. A. 44-1001 to expand the policy of the state and the purposes of the act. I cannot read the general policy declaration contained in 44-1001 as being any sort of implied limitation on the later substantive provisions of the act defining terms and proscribing specific unlawful conduct. That section, in large part, is legislative rhetoric of an aspirational nature. An amendment of this "purpose" and "policy" section to reflect any new and expanded coverage may promote symmetry in drafting but is not, in my opinion, necessary to make the amendments valid.

History reveals at least one instance where the legislature expanded the act's coverage into an entirely new area, and only later amended the statement of policy to embrace the new coverage. In 1970 the entire "fair housing act" was adopted (Laws of 1970,

ch. 193, now K. S. A. 44-1015 through 1029) and made "a part of the Kansas act against discrimination" (§ 15, now K. S. A. 44-1029). Yet it was not until 1972 that the purposes and policy section, 44-1001, was amended to reflect the fact that housing had been added to the areas covered. (Laws of 1972, ch. 194, § 1.) For two years one looking at 44-1001 to determine what discriminatory acts were prohibited by the act would have had no hint that discriminatory housing practices were among them. Yet I do not believe it would be contended that during those two years all fifteen sections of the fair housing act were dormant and ineffective, merely because the legislature had not formally declared that the policy so clearly reflected in those sections was in fact the public policy of the state.

On the basis of the above rationale I have concluded that the various amendments discussed above extended the act's coverage to the actions of any public officials which discriminate against persons in the rendition of any service to the public—first, by the redefinition of the term "public accommodations" in 1970 to include any person who offers his services to the public and, second, by the amendment of 1972 which made the anti-discriminatory act applicable to the services of any institution, department or agency of the state of Kansas or any of its political subdivisions or municipalities.

There remains for consideration the question whether the term "services" includes the arrest and in-custody treatment of an alleged law violator. The trial court after a careful examination of the statutory language found:

"2. An 'arrest' is such a service within the act and a citizen is entitled not to be discriminated against in the process of being arrested.

"3. An officer is exercising his authority in perfecting an arrest of a citizen of the State of Kansas and the United States is performing a service for and on behalf of a public facility, that is, the Topeka Police Department, when he is perfecting an arrest."

I am in complete agreement with the findings of the trial court in this respect. In my judgment what the legislature intended by amending our anti-discriminatory legislation to include all governmental agencies was that all persons should receive fair, equal and evenhanded treatment at the hands of their government. Such is the command of the Fourteenth Amendment and Section 1 of the Bill of Rights. By the anti-discrimination act the legislature simply made its creature, the commission on civil rights, an additional tool for the enforcement of the equal rights guaranteed by statute and the fed-

eral and state constitutions. Absent such a tool the citizen whose rights are abridged by a governmental agent could only seek recourse in the courts. While I am confident that a remedy would be forthcoming there, it is within the legislature's competence to afford another forum which it thinks speedier and less expensive.

The majority in this case have not determined the question presented as to whether or not an arrest is a "service" of the police department so that if it is discriminatorily made it would be an unlawful discriminatory practice. The prevention, detection and suppression of crime, the control of traffic and maintenance of the peace are police functions which must, I think, all be regarded as "services" to the citizenry at large. The making of an arrest is but one aspect of those services. In performing those functions I do not think a police department or a police officer may have a policy of arresting blacks under circumstances where it would not arrest whites, any more than they may have a policy of investigating crimes against whites while ignoring crimes against blacks. Either course of conduct would deny to blacks "the full and equal use and enjoyment of the services and facilities" of the department.

The result reached by the district court in this case necessarily flows from a consideration of the fundamental role of government in our society. In the Declaration of Independence our founding fathers recognized certain inalienable rights of all men, and went on to say, *"That to secure these rights,* Governments are instituted among Men, deriving their just powers from the consent of the governed."  This was to them and remains for us a "self-evident" truth. In the same vein, section 2 of our Kansas Bill of Rights recognizes that "All political power is inherent in the people, and all free governments are founded on their authority, *and are instituted for their equal protection and benefit."* The purport of both of these statements is that government in a democracy exists *only* to *serve* those whom it governs. It has no purpose and no other reason for being.

Hence, in a large but real sense, every function government performs is a "service" to the people; if it is not, government should not be performing it.  Some such "services" may be thought ill-advised and some, like taxation or arrests, may be unwelcome to their objects. They are all, nonetheless, part of the overall function of government and may properly be deemed "services" of government. In all such services equality is ordained by our statute as well as our constitutions.

I would hold, therefore, that the arrest of an alleged law violator and his subsequent treatment while in police custody are both governmental "services" covered by K. S. A. 44-1009 (c) (3). Since by expressed language discrimination in those functions is by definition an "unlawful discriminatory practice," the commission is entitled to investigate an allegation of such discrimination. Under K. S. A. 44-1004 (5) it may issue subpoenas in furtherance of its investigation, and if necessary secure a compliance order from the district court. I respectfully dissent from the decision of this court holding to the contrary. I would affirm the trial court.